UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BRITNEY TAYLOR,

                    Plaintiff,

        vs.

ANTONIO BROWN,

                    Defendant.

Case No.

**CIVIL COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Britney Taylor, by and through her attorneys Haas Law, PLLC, Emery Celli Brinckerhoff & Abady LLP, and The Law Offices of Marshelle I. Brooks, PLLC, alleges as follows for her Complaint:

**<u>INTRODUCTION</u>**

1.      This case is about how Antonio Brown – a highly successful wide receiver in the National Football League ("NFL") – exploited, sexually assaulted, and raped his former trainer Britney Taylor. Brown preyed on Ms. Taylor's kindness and her religious devotion, casting himself as a person equally dedicated to his religious faith and someone she could trust. In reality, he used manipulation and false promises to lure her into his world, and once there, he sexually assaulted and raped her. These heinous acts have inflicted severe and dramatic damage on Ms. Taylor, irreparably harming her.

2.      In June 2017, Brown sexually assaulted Ms. Taylor twice while they were together for training sessions. First, Brown exposed himself and kissed Ms. Taylor without her consent. Later that month, Brown, while positioned behind Ms. Taylor, began masturbating near her without her knowledge and ejaculated on her back. Ms. Taylor realized what occurred when she

1

felt a wet spot soak through her clothing. Later, in astonishingly profane and angry text messages, Brown bragged about the incident to her.

3.      Shocked and deeply embarrassed by this assault and his degrading messages, Ms. Taylor cut off her working relationship with Brown.

4.      However, several months later, Brown reached out to Ms. Taylor, expressing contrition, begging forgiveness and pleading with her to train him again. Ms. Taylor was hesitant but eventually agreed, swayed by his assurance that he would cease any sexual advances.

5.       Brown's assurances proved false.

6.      On May 20, 2018, Brown cornered Ms. Taylor, forced her down onto a bed, pushed her face into the mattress, and forcibly raped her.  Ms. Taylor tried to resist him, but Brown was too strong and physically overpowered her. She screamed and cried throughout the entire rape, repeatedly shouting "no" and "stop." Brown refused and penetrated her.

7.      Brown's assaults and rape have severely traumatized Ms. Taylor. Ms. Taylor has suffered near-daily panic attacks and suicidal ideations.

8.      Ms. Taylor brings this action to recover compensatory and punitive damages for the significant harm Brown caused by this brutal and sadistic misconduct.

## PARTIES

9.      Plaintiff Britney Taylor is a resident of Shelby County, Tennessee.

10.     Defendant Antonio Brown is a resident of Miami-Dade County, Florida.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction under 29 U.S.C. § 1332 because there is diversity between the parties, and the amount in controversy exceeds $75,000.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred here.

**JURY DEMAND**

13.     Plaintiff demands a trial by jury in this action.

**FACTS**

14.     Britney Taylor is a 28-year-old, world-class gymnast, who was born and raised in Memphis, Tennessee. She comes from a highly religious and close-knit family.

15.     Ms. Taylor started gymnastics when she was only three years old and soon became recognized as an athlete with exceptional abilities, discipline and dedication. In high school, she trained twice a day for a total of 40 hours per week, in addition to her course work. She reached "Elite" level, meaning she was eligible to compete for international competitions like the Olympics. She received 14 full college scholarship offers from schools with some of the best athletic programs in the country. This year, she will be inducted into the inaugural Tennessee Gymnastics Hall of Fame.

16.     She succeeded in the sport even though she often worked with unsupportive and verbally abusive coaches and was almost always the lone African-American gymnast on her team and at meets.

*I.*     ***Ms. Taylor Meets Brown at Central Michigan University***

17.     In 2010, Ms. Taylor started her freshman year at Central Michigan University.

18.     Ms. Taylor joined the college's Fellowship of Christian Athletes group. During her first meeting, she was paired with Antonio Brown as his bible study partner.

19.     Brown was well-known on campus and the football team's star wide receiver.

20.     A year later, Brown went to play in the NFL, becoming one of the most successful wide receivers in the league. Ms. Taylor transferred to Louisiana State University ("LSU"), but they remained in touch.

21.     In approximately 2013, Ms. Taylor's senior year at LSU, Brown sent her a message on social media, asking for a picture of her. Ms. Taylor sent him a picture of her face. Dissatisfied, Brown asked for a more revealing one. Ms. Taylor refused, reminding Brown that they were just friends.

22.     For approximately four years after Ms. Taylor graduated from LSU, the two fell out of touch.

23.     During that time, Ms. Taylor pursued her lifelong dream of opening a gymnastics training center for predominantly African-American girls in her hometown of Memphis. She wanted to create a safe and supportive environment for young girls of color to thrive in the sport of gymnastics – something that was often missing for her when she was a young girl.

24.     Ms. Taylor opened her training center in 2016. Her business grew quickly because of her knowledge of gymnastics and her devotion to her students. She even covered the cost of tuition for several students whose families were unable to afford it. After less than a year, she was training approximately 50 students and had another 200 students on her waiting list.

**II.     Brown Reconnects with Ms. Taylor**

25.     In June 2017, Brown reached out to Ms. Taylor via Facebook asking her how she was doing.

26.     Ms. Taylor responded that she was doing well and enthusiastically described the development of and plans for her gym.

4

27.     During the course of this renewed contact, Brown indicated he wanted Ms. Taylor's help improving flexibility and strength in his ankles and fast twitch muscles – areas in which she had developed expertise through gymnastics.

28.     As a result, the two agreed that Ms. Taylor would provide physical training services to Brown.

29.     The arrangement between them included Ms. Taylor flying to locations in Pittsburgh and Florida where Brown had homes and where he trained.

30.     Ms. Taylor never dated or had an interest in any romantic relationship with Brown. Their relationship, as far as Ms. Taylor believed and behaved, was that of a 'brother-sister' type.

### III.     Brown Engages in Inappropriate Behavior and Sexualized Misconduct

31.     During a training trip in early June 2017, Ms. Taylor was in one of Brown's homes in the Pittsburgh area, where she was staying because he had not booked her a hotel room. She was getting dressed in an upstairs bathroom when Brown walked in with his penis exposed. She immediately covered her eyes with her hands and walked out of the bathroom.

32.     Brown then grabbed and kissed her without her consent. Ms. Taylor pushed him away and immediately left the room.

33.     Brown's actions made Ms. Taylor extremely uncomfortable. She was in a long-term and serious relationship with another man and had no interest in a sexual relationship with Brown.

34.     But, because her professional relationship with Brown was important and because she took it seriously, Ms. Taylor willed herself to brush off the episode, hoping that Brown would stop pursuing her.

35.     In late June 2017, however, during another training visit, Brown and Ms. Taylor were watching a church service on Ms. Taylor's iPad in Brown's home in Miami, Florida. As they

had during their college Christian fellowship days, they often read scriptures, prayed or watched services together during training visits. On this occasion, Brown was behind Ms. Taylor as they watched the service on her tablet. Unbeknownst to Ms. Taylor, while she was focused on the religious video, Brown began masturbating behind her. Before she knew it or understood what was happening, Brown ejaculated on her.

36.     Specifically, Ms. Taylor felt a wet spot on her back and then suddenly realized what had happened. Thoroughly disgusted, Ms. Taylor exclaimed, "Ewww!" Brown, unfazed by her reaction, jokingly responded, "oh 'B'…you know, I'm sorry" and then left the room.

37.     Ms. Taylor was dismayed, confused and embarrassed. She called her mother, who advised her to immediately leave.

38.     She also confided in Brown's chef, whom she had befriended, about what happened and stated that she would not be returning to work for Brown. Shortly thereafter, she received a text message from Brown telling her she was fired.

39.     Brown also bragged in a preserved text message about masturbating on her, stating that he "jack [sic] [his] dick on [her] back" and that he was going to laugh with one of their mutual friends from college about it.



40.    He further demeaned her in repeated text messages, calling her a "weak bitch" and "dum [sic] ass hoe [sic]."

41.    Ms. Taylor cut off all contact with Brown as a result.

### IV.    Brown Convinces Ms. Taylor to Resume Training Him

42.    In February 2018, Brown sent Ms. Taylor a message thanking her for help in the off-season and stating that he would love to continue working with her under the "right circumstance[s]." He also mentioned that unlike many of the other people that surrounded him, she had "a great heart and . . . cared" about him.

43.    Ms. Taylor did not respond to his message.

44.    Then, in early March 2018, Brown sent Ms. Taylor another message asking her if she hated him now. He went on to say: "I apologize first off with so much going on around me and my actions." He asked for her to train him again, assuring her that things would be different.

45.    Ms. Taylor agreed, but on the condition, which is reflected in writing, that Brown stop flirting with her anymore. She also required that he provide her hotel accommodations for each trip.

46.     In approximately April 2018, Ms. Taylor returned to working during off-season weekends for Brown.

47.     His life, at this point, was in apparent chaos. Many of the people who worked with him previously had quit, including his chef and another trainer. They could no longer take Brown's mistreatment and troubling behavior.[1]

48.     He was also having trouble balancing the responsibilities he had arising out of his many endorsement deals, including with Campbell's Soup, Nike, Pepsi, Pizza Hut, AT&T/DirecTV, and Rite Aid, among others. He showed up late to events he was required to attend for those sponsors or otherwise failed to hold up his contractual obligations.

49.     In the wake of staff defections and the chaos surrounding him, Brown often relied on Ms. Taylor to take care of his administrative needs when she was there with him on weekends. She was tasked with booking flights for him, keeping his travel schedule, making sure he arrived at sponsored events on time, and even babysitting his children.

### V.     *Brown's Aggression Escalates to Rape*

50.     On approximately May 20, 2018, Brown invited Ms. Taylor, another football player who trained with them, and a few friends for a night out while they were in Miami.

51.     The group went to a club.

52.     Ms. Taylor, Brown, and the other known football player left the club together in Ms. Taylor's rental car. She drove the two men back to Brown's home, where they were staying.

---

[1] Brown is no stranger to controversy. Many incidents involving him have been widely reported in the press. He has been accused of throwing objects off a balcony in a rage, nearly striking a toddler. He engaged in a public spat with the mother of one of his children, and he was recently accused by the mother of another one of his children of physical assault. Further, conflicts and arguments with NFL officials, reporters, and teammates have been commonplace.

53.     Ms. Taylor was planning to immediately drive to her hotel room but went into Brown's home to use the restroom and grab some food from the kitchen. While Ms. Taylor was walking toward the front door, Brown grabbed her arm, told her he wanted to talk to her, and pulled her into his bedroom.

54.     They chatted for a few minutes, and when Ms. Taylor went to walk out of the room, Brown cornered her and pulled her down on the bed on her stomach, pushing her face down into the mattress.

55.     She attempted to physically resist, but he pinned her down so that she was unable to fight back.

56.     As she struggled, he lifted her dress and told her, "you know you want this."

57.     Ms. Taylor pleaded with him, shouting "no" and "stop." But Brown refused and proceeded with great violence to penetrate her.

58.     Ms. Taylor protested and cried the entire time.

59.     When Brown finally released her, Ms. Taylor stood up in a state of trauma and shock, crying in front of him.

60.     Devastated and disoriented, she ran into his foyer and collapsed on the ground. No one came to her rescue or to help her in any way. She was completely alone. Eventually she summoned the strength to pick herself off the floor, make it to the door, get into her car and drive— dazed and emotionally shattered—to her hotel. She was so exhausted that she fell asleep at a stoplight on the drive back.

61.     The next day, Ms. Taylor had to return to Brown's home to retrieve personal belongings before flying back to Memphis.

9

62.     She courageously approached Brown, telling him that they "needed to talk about last night."  He replied, "You made me feel like a real rapist."

63.     Ms. Taylor left Brown's Miami home.

64.     Although she had to return to Brown's Miami home to retrieve some personal belongings, she ceased working for Brown thereafter.

**VI.     Brown's Actions Have Severely Traumatized Ms. Taylor**

65.     In the days after the rape, Ms. Taylor feared she could have become pregnant or could have contracted a sexually transmitted disease ("STD") from Brown.  Specifically, on June 13, 2018 and July 1, 2018, she purchased a home pregnancy test and an STD test kit from Walgreens.

66.     For months after the rape, Ms. Taylor did her best to put what happened out of her mind. As is typical with many victims of rape, she made attempts to live her life as if nothing happened.

67.     Those attempts to compartmentalize, deny and normalize her life proved unsustainable.

68.     After several months, the shock, disbelief and denial gave way to overwhelming bouts of anxiety, and Ms. Taylor fell into a deep depression. She has had near-daily panic attacks, frequent suicidal ideations, and insomnia. She has also lost a remarkable amount of weight – 30 pounds in one month – due to stress. It has been extremely difficult for her to process that Brown could betray and violate her so completely.  Brown devastated her sense of self, made her question her worth as a woman and human being, and caused her to question whom she could trust.

69.    On January 6, 2019, before seeking legal counsel, Ms. Taylor reached out to #TimesUpNow about the rape.  While she does not know if her message was ever received by the organization, she described the rape without naming her assailant.

70.    In all, Brown has caused serious and extreme damage to Ms. Taylor – harm that impacts all aspect of her life, both personally and professionally. She will bear the scars of what Brown did to her for the rest of her life and she will never be the same.

71.    The trauma has made it extremely difficult for Ms. Taylor to maintain her responsibilities at her gym. She knows that she is a role model for the 50 young girls that she trains. She knows that that they rely on her and that they look up to her. But since this the rape, she has substantial difficulty even going to work.

72.    The assault also has had a profound and negative impact on her personal life. Her long-term boyfriend, whom she had been dating on and off ever since high school, proposed to her less than two weeks after she was raped by Brown. What should have been one of the most exciting times in her life has been completely derailed and complicated. It took her months to tell her fiancé what occurred, and that disclosure put a serious strain on their relationship.

73.    As a result of the difficulties in the relationship with her fiancé and the extreme emotional difficulties she was having in the wake of the rape, Ms. Taylor turned to her religion and sought guidance with a leader at her church. As it turned out, the leader was a former Assistant District Attorney ("ADA") and Sex Crimes Prosecutor who had worked for many years in New York. This former ADA, now turned religious leader, immediately recognized the signs of trauma Ms. Taylor was experiencing because of the sexual assault, and recommended she enter intensive therapy and retain legal counsel.

74.     Since that time, Ms. Taylor has taken a polygraph examination. It was conducted by one of the nation's leading examiners, who previously led the FBI's polygraph program. Ms. Taylor had to relive the trauma of these events through this examination. The polygraph examination confirmed her completely truthful account that, in June 2017, Brown ejaculated on her without her consent and that, in May 2018, that Brown raped her.

## FIRST CAUSE OF ACTION
### Sexual Battery (Rape)

75.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

76.     Defendant Brown had sexual intercourse with Plaintiff.

77.     That act was done without the consent of Plaintiff.

78.     As a result of Defendant's acts, Plaintiff has been damaged and brings these civil claims for the physical, emotional and psychological injuries she suffered.

79.     Defendant's acts were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights, for which she is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### Battery

80.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

81.     By intentionally ejaculating on Plaintiff without her consent as described above, Defendant committed a battery.

82.     By kissing Plaintiff without her consent as described above, Defendant committed a battery.

83.     As a result of Defendant's acts, Plaintiff has been damaged and brings these civil claims for the physical, emotional and psychological injuries she suffered.

84.     Defendant's acts were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights, for which she is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

85.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

86.     As described above, Defendant Brown's conduct of sexually assaulting and raping Plaintiff was outrageous and caused Plaintiff to suffer severe emotional and psychological harm.

87.     Defendant's acts were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights, for which she is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### False Imprisonment

88.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

89.     By restraining Plaintiff in his bedroom and preventing her from leaving against her will, Defendant Brown falsely imprisoned Plaintiff.

90.     As a result of Defendant's acts, Plaintiff has been damaged and brings these civil claims for the physical, emotional and psychological injuries she suffered.

91.     Defendant's acts were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights, for which she is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
### Invasion of Privacy

92.     Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

93.     Defendant's unwanted and offensive sexual contact with Plaintiff was an invasion of her physical solitude and privacy.

94.     As a result of Defendant's acts, Plaintiff has been damaged and brings these civil claims for the physical, emotional and psychological injuries she suffered.

95.     Defendant's acts were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights, for which she is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant her the relief requested as follows:

A.     An award of damages to be determined at trial to compensate Plaintiff for all non-monetary and compensatory harm, including, but not limited to, compensation for her physical injuries, pain and suffering, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering;

B.     An award of punitive damages, in an amount to be determined at trial, sufficient to deter Defendant from engaging in future illegal and/or wrongful conduct;

C.     Such other and further relief as the Court may deem just and proper.

Dated: September 10, 2019

Respectfully submitted,

**HAAS LAW, PLLC**

*/s/ David Haas*

DAVID HAAS
201 S. Orange Avenue, Suite 1017
Orange, FL 32801
Phone: (407) 755-7675
Email: David@HaasLawPLLC.com
Florida Bar No.: 0494674

**EMERY CELLI BRINCKERHOFF & ABADY LLP**

*/s/ Jonathan S. Abady*

JONATHAN S. ABADY
600 Fifth Avenue, 10th Floor
New York, New York 10020
Phone: (212) 763-5000
Email: JAbady@ecbalaw.com
(*Pro hac vice motion to be submitted*)

**THE LAW OFFICE OF MARSHELLE I. BROOKS, PLLC**

*/s/ Marshelle I. Brooks*

MARSHELLE I. BROOKS
720 W. Dr. Martin Luther King Jr. Blvd
Suite B
Tampa, FL 33603
Phone: (813) 598-6364
Email: marshelle@mibrookslegal.com
Florida Bar No.: 109403
(*SDFL Admission to Be Submitted*)

*Attorneys for Plaintiff Britney Taylor*